IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Criminal Action No. 16-50-CFC |
| | : | |
| WILLIAM COOK, | : | |
| | : | |
| Defendant. | : | |

---

Whitney C. Cloud, Lesley F. Wolf, Assistant United States Attorneys, Wilmington, Delaware

*Counsel for United States of America*

Thomas E. Carluccio, LAW OFFICE OF THOMAS E. CARLUCCIO, Plymouth Meeting, Pennsylvania; Frank G. Fina, LAW OFFICE OF FRANK G. FINA, Plymouth Meeting, Pennsylvania

*Counsel for Defendant*

**<u>Memorandum Opinion</u>**

December 11, 2018
Wilmington, Delaware

_____

CONNOLLY, UNITED STATES DISTRICT JUDGE

Presently before me are competing motions filed by the parties: the government's Motion *in limine* to Admit Evidence Regarding July 10, 2013 Meeting between Defendant and Artisan's Bank (D.I. 74) and Defendant's Motion *in limine* to Exclude Statements of Defendant's Prior Counsel (D.I. 76). Both motions ask me to rule on the admissibility at trial of testimony from three Artisans' Bank (the "Bank") employees about statements made to them by Defendant's prior counsel in Defendant's presence at a meeting in July 2013. The government argues that the out-of-court statements of Defendant's prior counsel are an "adoptive confession" of the Defendant that are admissible under Federal Rule of Evidence ("FRE") 801(d)(2)(B) and (C). D.I. 74 at 9. Defendant argues that the statements of his prior counsel were made in connection with settlement negotiations and are barred by FREs 408 and 802 from being admitted at trial. I have studied the parties' briefing on the matter and heard oral argument on December 4, 2018.[1]

_____

[1] I note for the sake of completeness of the record that Defendant's prior counsel, whom I have never met, is now a federal judge in another District. The parties do not dispute that the prior counsel's status as a judge has no bearing on the issue before me.

## I. Background

### A. The Superseding Indictment

Defendant has been charged by Superseding Indictment with one count of bank fraud, four counts of making false statements to a bank, and one count of money laundering. D.I. 36. The charges arise out of a line of credit extended by the Bank to Defendant's food broker business, AJJ Distributing, LLC, between 2008 and 2013. The line of credit was secured in part by accounts receivable owed to AJJ. Under the terms of the line of credit, the amount of money Defendant could borrow from the Bank was dependent on the value of "eligible items," a term which the line of credit agreement defined as "accounts receivable and inventory aged less than 90 days." *Id.* ¶ 11. Defendant was contractually obligated to submit to the Bank on a weekly basis and when he sought withdrawals from the line of credit Borrowing Base Certificates ("BBCs") that listed AJJ's "eligible items." *Id.* ¶¶ 13, 14.

The false statement counts in the Superseding Indictment are based on allegations that Defendant provided the Bank on four occasions with BBCs that listed certain accounts receivable that in fact were no longer owed to Defendant. *See id.* ¶¶ 46, 48, 50 and 52 (alleging Defendant "provided the Bank with a BBC listing [million-dollar sums] in accounts receivable, which falsely inflated monies owed to AJJ"). The bank fraud count is similarly based in part on the allegation

that Defendant submitted to the Bank "false and fraudulent" BBCs that "included as 'eligible items' accounts receivable that were no longer owed to AJJ." *Id.* ¶ 33. The bank fraud count alleges specifically that Defendant submitted BBCs that "included dozens of accounts receivable" from AJJ's primary customer that "were no longer owing to AJJ." *Id.* ¶ 30.

The allegations in the bank fraud count, however, would also support an alternative prosecution theory that the BBCs were false because they listed accounts receivable that were older than 90 days. The Superseding Indictment alleges in the bank fraud count that "eligible items" were defined as "accounts receivable and inventory aged less than 90 days" (¶ 11), that "AJJ agreed to identify 'eligible items' to the Bank in the form of Borrowing Base Certificates ('BBCs') listing all accounts receivable less than 90 days old" (¶ 13), that "AJJ's eligible accounts receivable were less" than Defendant represented in the BBCs (¶ 36), and that the Bank utilized Defendant's "false and fraudulent BBCs reporting AJJ's eligible accounts receivable in evaluating requests for extensions or restructuring of the Line of Credit" (¶ 41). Further, in describing the scheme to defraud on which the bank fraud charge is based, the Superseding Indictment alleges that "[b]y listing non-'eligible items' on the BBCs," Defendant "falsely and fraudulently inflated AJJ's accounts receivable, which: a) induced the Bank to disburse money under the Line of Credit to AJJ; b) influenced the Bank's decisions

in connection with extensions and conversions of the Line of Credit; c) deterred the Bank from requiring larger payments on the Line of Credit; and []d) delayed the Line of Credit's termination." *Id.* ¶ 34.

## B. The July 2013 Meeting

According to the Superseding Indictment, Defendant's false statements and fraudulent scheme induced the Bank to loan AJJ millions of dollars; and, by July 2013, AJJ owed and was unable to repay the Bank approximately $4.2 million. The evidentiary dispute before me concerns a meeting Defendant and his prior counsel had with Bank employees in July 2013 to discuss Defendant's then-outstanding debt.

### 1. Purpose of the July 2013 Meeting

According to Defendant, "[t]he only purpose for having th[e] [July 2013] meeting was to discuss the loan and to negotiate whether the loan was going to continue, the terms under which it was going to continue." Tr. 11:23–12:1. The grand jury testimony of Defendant's prior counsel confirms and adds detail to this stated purpose:

> I was there [at the July 2013 meeting] to tell them that [Defendant] would not be making any further payments because his stream of income from these receivables [would not continue]. . . .
> . . . And I told them that [AJJ's primary customer] was cutting off its business with [Defendant] and that the receivables would not be – he would not have the same

stream of receivables, and that we have to figure out a
way to go forward and settle the civil case.

\* \* \* \*

The whole idea was how he was going to pay back the
loan.

D.I. 74, Ex. B at 10:20–11:8, 18:25–19:1.

Defendant has not suggested that the Bank initiated or threatened a civil law

suit. It is clear from later portions of Defendant's prior counsel's grand jury

testimony that the "settlement" he was trying obtain for Defendant was an

arrangement that would resolve any potential claims AJJ's primary customer and

Defendant had relative to each other and at the same time restructure the

repayment terms for the debt Defendant owed to the bank:

> Q. And again, I'm not seeking any attorney/client
> privileged communications here, but in terms of the
> period – and it sounds like it was about a month or so
> where you were involved in a series of meetings, both
> with [the primary customer] and with Artisans' Bank.
> A. Yeah, one meeting with Artisans, two with [the
> primary customer].
> Q. Was the information that you were conveying to
> the third parties based on any independent investigation
> or review, or were you relying in large part upon
> information furnished to you by your client?
> A. . . . I can't say [Defendant] told me, but as far as
> what I learned regarding the information about the
> receivables, that came from his discussions that he had
> with [AJJ's primary customer] in my presence, so it
> wasn't really attorney/client. So, yes, to some extent it
> would be [Defendant] talking to [AJJ's primary
> customer] in my presence. My job again was to negotiate
> a civil – to get out of it, and negotiate a civil end to it.

Q.     And that was your understanding of why you were brought in, or was that an explicit, you know, term of engagement –

A.     No, there had been – it was just, [Defendant's prior counsel], can you help me? I need to negotiate my way out. [AJJ's primary customer] has this problem with this guy. They're going to stop the business. I owe X amount of dollars to the bank. I need to get the – I need to work it out with the bank and to work it out with [AJJ's primary customer]. Typically, we do that at a bankruptcy.

We get everybody in the room and say, you owe, you owe $10 to the bank. You have a deal with these guys. How can we work this out over three years? That's what I was hoping.

*Id.* at 34:10–35:20.

## 2. Defendant's Prior Counsel's Statements at The Meeting

According to the government:

> During the meeting, [Defendant's prior counsel] stated that he was attending with Defendant as his "friend" and would be speaking on his behalf. [Defendant's prior counsel] acknowledged that Defendant had been submitting falsified Borrowing Base Certificates to the Bank since approximately 2009. Further, [Defendant's prior counsel] conceded that Defendant had used the money from the line of credit, in large part, to fund his other businesses. As a result, the collateral to secure the line of credit and loans did not exist. [Defendant's prior counsel] recognized that Defendant owed money (roughly 4.2 million) on the outstanding AJJ loans and line of credit and wanted to repay them, but that Defendant had no ability to pay. When one of the Bank witnesses described Defendant's conduct as bank fraud, [Defendant's prior counsel] agreed with that characterization. [Defendant's prior counsel] closed the

> meeting by saying that he and his client would next be
> meeting with the Attorney General's Office.

D.I. 74 at 3–4. The government has proffered that it will present this account of

the meeting at trial through the testimony of three members of the Bank's loan

workout group who participated in the meeting. The government cites in support

of this account of the July 2013 meeting: (1) a memorandum written "one to two

days" after the meeting by one of the three Bank employees, and (2) three reports

written by a Postal Inspector who interviewed the three Bank employees in

question. *See generally* D.I. 74, Ex. A.

I have reviewed the memorandum and reports and find that they are

generally consistent with each other and support the government's account of the

July 2013 meeting. According to the memorandum, for example, the meeting was

held at Defendant's request "to discuss workout arrangements," and during the

meeting

> [Defendant's prior counsel] stated that [Defendant] wants
> to repay the Bank's loans, but that the Bank's collateral
> securing the line [of credit] is "not there," and[,]
> further[,] approximately 85% of the receivables securing
> [the] line were "falsified" beginning in 2009. I [the
> memorandum's author] responded that [Defendant] has
> committed Bank Fraud and [Defendant's prior counsel]
> agreed[,] stating that was true in the case of receivables.

*Id.* at 3.

Neither the memorandum nor the reports of interviews explain or suggest what any participant in the July 2013 meeting understood "falsified" accounts receivable to mean. Thus, it is impossible to discern from the government's proffer if the government is saying that the Bank employees and Defendant's prior counsel believed the accounts receivable listed on Defendant's BBCs were "falsified" because they were already satisfied, older than 90 days, or for some other reason. It is similarly impossible to discern from the government's proffer exactly why any participant in the meeting would have concluded that Defendant had committed bank fraud, other than because Defendant had listed accounts receivable that were "falsified" in some unidentified way.

Defendant argues that the grand jury testimony of his prior counsel "directly and materially contradicts" the government's account of the July 2013 meeting. D.I. 89 at 2. The government acknowledges that Defendant's prior counsel "provided a somewhat[ ] different recollection of the meeting" in his grand jury testimony, D.I. 74 at 4, but not in any way material to my deciding whether the government can introduce at trial through the testimony of the three Bank employees the statements of Defendant's prior counsel at the July 2013 meeting.

I have reviewed carefully the testimony Defendant's prior counsel gave before the grand jury on March 28, 2017 — i.e., almost four years after the July 2013 meeting. I question whether I need to determine the extent to which that

testimony corroborates or conflicts with the proffered testimony of the three bank

witnesses, but in any event I do not agree with Defendant that his prior counsel

"rejected the Government's assertions on virtually every material aspect regarding

his contacts with Artisan's Bank." D.I. 89 at 3. The grand jury testimony —

perhaps because it was given so many years after the July 2013 meeting — is much

more equivocal than Defendant suggests.

For example, Defendant argues that his prior counsel "flatly rejected" that he

told the Bank that Defendant had submitted false documentation with respect to

accounts receivable. D.I. 89 at 3. But the actual testimony is as follows:

> Q.     Did you say that a number of the receivables
> securing the line of credit were falsified?
> A.     That a number of the receivables – the line of
> credit were – no. I did not say that. I would not have
> known that. I would not have known that the receivables
> – I don't know today if they were falsified.
>        What I knew was that there was a stream of
> receivables coming in that [a wholesaler] owed that the
> bank financed, and that those receivables were due and
> owing maybe more than 90 days. There was a 90-day
> provision, and they may have been due more than 90
> days. But I don't ever recall saying it was falsified.
>        I do remember saying that it was – that the
> receivables were outstanding and you wouldn't – you
> couldn't get your money today.
>                         * * * *
> Q.     Okay. Did you state that the receivables had been
> falsified since 2009?
> A.     No. No. I never used the word falsified. What I
> remember saying is that when the real estate market
> crashed in 2008-2009, [Defendant] had taken money
> away from the line, this banker – because they refinanced

it in 2011 or something – and they had agreed to start funding the real estate loans of all these properties in Ocean City, Maryland, and that that began in 2009. I don't – I'm pretty sure I never said the word – I'm pretty careful not to say the word falsified.

Q.     Okay.

A.     I don't think I said the word falsified. I don't recall it, but I don't think I would have said that.

Q.     Did one of the employees state that [Defendant] had committed bank fraud?

A.     I don't remember that. I remember saying – I remember someone using the word fraud. And I said, look, this is on both sides. I said, you have a problem under a Bank Act – and I'm sure you don't have to worry about it, but there's a Bank Act that you have to report on a fidelity bond, loan officers would know about these transactions.

And I said, I'm glad to go with you. I've done this for a bank. Somebody said, well, this could be fraud. And I said, yeah, it would be fraud on both sides. . . .

What I understood, without disclosing attorney/client, is that when I looked at the financial – when I went into the room and I said here's the problem, you [the Bank] had the problem of extending – of converting a non-performing receivable loan in 2011 to a term loan. And that may be a fraud for the Office of the Comptroller of the Currency. You're not allowed to do that. I knew that as a bank director.

And I said, I don't want to say anything here. I said, we have to figure out – the man [Defendant] wants to pay back this loan, but you have a problem too because you converted a receivable loan to a term loan, knowing that the receivables that were due from [the wholesaler] were running behind. They weren't all 90 days. . . .

Q.     So in essence – and correct me if I'm wrong – your understanding is that the bank may have made, or the loan officer at the bank may have inappropriately converted a non-performing loan to a term loan, and kept the line of credit attached, in essence –

A.    I used the wrong word.  It's performing in a sense he's paying every month, but he's paying back every month.  In fact, until I was in the room, he was paying back every month.  Right?  He's paying interest back every month.

Q.    Okay.

A.    So it was performing in the financial sense, but since – as I told them, since 2009 – and I said, your guy knows this because he was in on the real estate transactions.  Since 2009, the money that was being paid from [the wholesaler] has also been being paid to take care of these crazy problems in Ocean City for all the real estate.  Okay?

So what you – your banker knew that he needed to get better security, to answer your question.  So the idea was, you took a loan that you knew had receivable problems in 2010 or '11, whatever it was, and I said you converted that to a term loan.  I wasn't there trying to cast aspersions on either one.  I was trying to get a negotiation saying, look, nobody makes any sense here.

Yes, [Defendant] took money from a receivable line and paid real estate loans so that the real estate transactions would [not] default.  He was doing what a lot of people did in 2009.  He was moving money around to do it.  And I said that.

But I said, this is not a surprise to your bankers because you termed a loan out, part of a loan out – actually it wasn't a loan – part of a loan so you'd get security. . . .

Q.    But in the course of this discussion there was an acknowledgement by you that [Defendant] had taken funds from a business line of credit and diverted those funds to pay real estate expenses?

A.    What I said was – I don't think I said that.  I think they said that.  They said, did he take – I said, look, to the extent he paid real estate loans – but that's no surprise to you guys.  So, I didn't admit – first of all, I couldn't admit it.  I don't know that.  But they made the argument to me, and I said, yeah, well, you know that.

So I didn't say he diverted – but having been in the room, I heard what they said, and that's why I explained to them, well, you have a problem as well.

Q.     And all of that presupposes that [Defendant] was submitting timely and accurate information to the loan officer at the bank.  Correct?

A.     I thought – yes.  I had no –

Q.     And at that –

A.     -- I had no dispute.

Q.     And at that time, it was your understanding that [Defendant] had submitted true and accurate information to the bank in connection with his loans at Artisan's Bank –

A.     In connection –

Q.     -- and the line of credit?

A.     Sure.  Yes.  It was my understanding that at the time I went into the room, they had never defaulted, and that the receivables on the sheet were receivables.  They just weren't all within 90 days.

Q.     Okay.

A.     So, it's a standard civil problem.  I'd run into these cases all the time in practice, that the small businessman runs behind 90 days and he keeps the 90 days – he keeps them on 90 days.  That I had saw – no, excuse me, I didn't see that, but that's what they explained to me. And I said, well, that's what happens all the time.  So I was trying to – it was a civil dispute and I was trying to settle it.

Q.     Okay. . . . So, as you understood the issue was that the receivables were over 90 days?

A.     Some may have been.

Q.     Some had aged.

A.     Yes.  No, that's what I understood it from them.

Q.     But they remained – but it was your understanding they remained from [the wholesaler] due and owing to [Defendant], or from – that they were due and owing – receivables were still on the – properly on the books as due and owing?  It was just the age that was the issue?

A.     Yes.  And the problem with age is, you can't count things that are too old.

Q. And the reason for that in banking – if you could tell the grand jury, if you know?

A. It's because they're stale and you're not going to collect. . . .

So, yes, I was aware – look, let me say this to you. I wasn't aware from [Defendant], but I was aware what they were talking in the room was a receivable problem. And that is really the perfect Chapter 11 bankruptcy because then you go into bankruptcy and you restructure your receivables. And I said, who wants to really go into bankruptcy on this?

And that's when I – the first time I heard fraud was in that room. And I said, oh wait a second here. Before we – if you want to talk about fraud, I'll help you. In fact I think I said, I'll go to the police. I'll go to whoever you want me to go to, but we should all go together because we have a problem on both sides here.

Q. But you had no understanding at this meeting, and in the course of the meeting, that a number of the receivables that had been submitted to the bank had in fact previously been paid – as were still outstanding?

A. Previously been paid?

Q. Had previously been paid –

A. No.

Q. -- and were no longer actual receivables?

A. No.

Q. Okay.

A. No, you're the first – no, I never heard that. I thought they were stale.

Q. Okay.

A. I didn't think they were, I didn't think they were paid. I thought, I thought he was borrowing on a borrowing base that included stale receivables. I didn't know they were paid, and still don't know they were paid.

D.I. 74, Ex. B at 19:15–28:9.

I do not agree with Defendant that this testimony "flatly rejects" the government's allegation that Defendant submitted falsified listings of accounts receivable to the bank. On the contrary, portions of the testimony would appear to corroborate the allegation in the Superseding Indictment that Defendant knowingly submitted listings of accounts receivable that were not "eligible items" (i.e., were not less than 90 days old). The testimony can also be read as consistent with the government's proffered testimony of Bank employees that "falsified" listings of accounts receivable and "fraud" were discussed at the meeting, even if it is not clear from the testimony that Defendant's prior counsel and the Bank employees had the same understandings about why the listings could be fairly described as "falsified" or what was intended by the use of "fraud" at the meeting.

## II.    Discussion

As noted above, the government seeks to introduce at trial through the testimony of the three Bank employees the out-of-court statements made by Defendant's prior counsel at the July 2013 meeting. Defendant argues that the statements of his prior counsel were made in connection with settlement negotiations and are barred from admission at trial by FREs 408 and 802. The government argues that the out-of-court statements of Defendant's prior counsel are an "adoptive confession" of the Defendant that are admissible under FRE 801(d)(2)(B) and (C).

## A. Rule 408

Federal Rule of Evidence 408 reads as follows:

> (a) Prohibited Uses. Evidence of the following is not admissible — on behalf of any party — either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
>> (1) furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim; and
>>
>> (2) conduct or a statement made during compromise negotiations about the claim — except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
>
> (b) Exceptions. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

FED. R. EVID. 408.

By its express terms, the rule prohibits the admission of certain evidence if the evidence is offered for either of two purposes: (1) "to prove or disprove the validity or amount of a disputed claim" or (2) "to impeach by a prior inconsistent statement or a contradiction." Neither purpose exists here. The government has stated explicitly that it is not seeking to introduce the statements of Defendant's

prior counsel to prove the validity or the amount of debt he owed to the Bank. *See* Tr. at 7:13–15 ("[T]he Government is not seeking to introduce this evidence to prove that the defendant owed [the] Bank $4.2 million"). There is also of course no testimony at this point to impeach or contradict by such evidence. Rather, the stated purpose for which the government seeks to introduce the testimony is to prove that Defendant knowingly made and submitted false BBCs and intentionally defrauded the Bank. Rule 408 does not prohibit that "use" and therefore even if Defendant's prior counsel's statements constituted settlement negotiations, Rule 408 does not preclude those statements from being introduced into evidence at trial. *See Roe v. McKee Mgmt. Assocs., Inc.*, 2017 WL 690538, at *3 (E.D. Pa. Feb. 21, 2017) (Kearney, J.) ("The settlement discussions are not an issue because [the proponent's] allegations address the causation elements of the [] claim. They are not introduced for a use Rule 408 prohibits."); *see also Affiliated Mfrs., Inc. v. Aluminum Co. of America*, 56 F.3d 521, 526 (3d Cir . 1995) ("The application of [Rule 408] is limited to evidence concerning settlement or compromise of a claim, where the evidence is offered to establish liability, or the validity or amount of the claim."); FED. R. EVID. 408, advisory committee's note to 2006 amendment ("The amendment retains the language of the original rule that bars compromise evidence only when offered as evidence of the 'validity,' 'invalidity,' or 'amount' of the disputed claim. The intent is to retain the extensive case law finding Rule 408

inapplicable when compromise evidence is offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim.").

Rule 408 would not bar the admission of Defendant's prior counsel's statements for a second, independent reason — namely, the absence of a disputed claim. *See* 23 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5303 at 201 (2d ed. 2018) ("Rule 408 excludes the evidence only if the claim is disputed."). As made clear by Defendant's prior counsel's grand jury testimony, Defendant did not dispute the fact that he owed the Bank money; nor did he dispute the amount of money he owed. Indeed, Defendant did not have a pending dispute with the Bank as of the July 2013 meeting. It may have been the case that, going into the July 2013 meeting, Defendant anticipated that he would have a dispute with the Bank *after* the meeting, as his counsel planned on telling the Bank at the meeting that AJJ's primary customer "was cutting off its business with" Defendant and that Defendant therefore "would not be making any further payments" to the Bank. D.I. 74, Ex. B at 10:20–11:8. But, as counsel testified before the grand jury, "[t]he whole idea [of having the July 2013 meeting] was [to accomplish] how [Defendant] was going to pay back the loan." *Id.* at 18:25–19:1. Thus, there was no disputed claim as of the time the July 2013 meeting occurred, and any discussions that occurred during that meeting — even if Defendant intended those discussions to lead to a restructuring or reduction of his repayment

obligations — are not barred from admission at trial by Rule 408. *See* FED. R. EVID. 408 advisory committee's note to 1972 proposed rule ("The policy considerations which underlie the rule do not come into play when the effort is to induce a creditor to settle an admittedly due amount for a lesser sum. Hence the rule requires that the claim be disputed as to either validity or amount.").

## B. Rule 802

Defendant also argues that his prior counsel's statements are hearsay and barred from admission at trial by Rule 802. The Government counters that the "[s]tatements made by [Defendant's prior counsel] during this meeting qualify as statements of the Defendant for two reasons: they were statements adopted by Defendant through his silence and conduct during the meeting pursuant to Rule 801(d)(2)(B), and they were also statements made by an authorized agent or representative of the Defendant pursuant to Rule 801(d)(2)(C)." D.I. 74 at 10–11.

I find that the statements of Defendant's prior counsel at the July 2013 meeting are admissions by an authorized agent of a party opponent and not hearsay under Rule 801(d)(2)(C) and (D). Rule 801(d)(2) excludes from the definition of hearsay a statement that "is offered against an opposing party and . . . (C) was made by a person whom the party authorized to make a statement on the subject; [or] (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]" FED. R. EVID. 801(d)(2). The parties

agree that Defendant's prior counsel represented Defendant as Defendant's attorney at the July 2013 meeting. Therefore, Defendant's prior counsel was Defendant's authorized legal agent for purposes of this meeting, rendering admissible under Federal Rule of Evidence 801(d)(2) Defendant's prior counsel's statements on Defendant's behalf. *See, e.g., In re Joy Global, Inc.*, 346 B.R. 659, 665 n.13 (D. Del. 2006) (Jordan, J.) (referring to "ample authority for the proposition that an attorney's statements may bind the party whom the attorney represents" either "under Federal Rule of Evidence 801(d)(2)(C) or (D)").

I do not agree with the government that Defendant's silence at the time his prior counsel made the statements would allow the statements to be admitted under Rule 801(d)(2)(B). "Whether a statement is admissible as an adoptive admission [under Rule 801(d)(2)(B)] turns on (1) whether the statement was such that, under the circumstances, an innocent person would deny the statements and (2) whether there are sufficient foundational facts from which the jury may infer that the defendant heard, understood, and acquiesced in the statement." *See United States v. Lafferty*, 503 F.3d 293, 306 (3d Cir. 2007). "When silence is relied upon [to show that the party opponent acquiesced in the statement] the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue." *Id.* (quoting FED. R. EVID. 801 advisory committee's note to 1975 proposed rule). In light of Defendant's desire to restructure, if not reduce, his debt

repayments to the bank, and the fact that he retained experienced counsel to accomplish that goal for him, I do not believe Defendant would have felt compelled to correct any statement made by Defendant's prior counsel at the July 2013 meeting.

## C. Rule 403

Notwithstanding my rejection of Defendant's arguments that Rules 408 and 802 bar the admission of his prior counsel's statements, "Rule 403 always remains as a potential bar to admissibility." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 786 (3d Cir. 1996). Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

I have no doubt that the statements of Defendant's prior counsel are relevant evidence with probative value. Based on the Bank employee's memorandum, the Postal Inspector's reports of interviews, and Defendant's prior counsel's grand jury testimony, I expect that the parties will argue vigorously at trial what exactly was said and by whom at the July 2013 meeting and what was meant by the words "fraud" and "falsified" to the extent those words were used at the meeting. I do not think, however, that the admission into evidence of the testimony sought by the government will create a danger of unfair prejudice or misleading or confusing the

jury that substantially outweighs the probative value of the testimony.  Nor do I think that the testimony implicates the remaining Rule 403 factors.  Accordingly, I will allow the government to present the testimony at trial.

The Court will issue an order consistent with this Memorandum Opinion.