# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA     :
                                       :
                                       :
              v.              :         Criminal Action No. 16-50-CFC
                                         :
WILLIAM COOK,             :
                                       :
                  Defendant. :

---

Whitney C. Cloud, Lesley F. Wolf, Assistant United States Attorneys, Wilmington, Delaware

*Counsel for United States of America*

Thomas E. Carluccio, LAW OFFICE OF THOMAS E. CARLUCCIO, Plymouth Meeting, Pennsylvania; Frank G. Fina, LAW OFFICE OF FRANK G. FINA, Plymouth Meeting, Pennsylvania

*Counsel for Defendant*

## **MEMORANDUM OPINION**

January 3, 2019
Wilmington, Delaware

The government has filed a Motion in Limine Re: 404(b) Evidence (D.I. 70), by which it seeks to admit evidence relating to certain contacts Defendant William Cook had with an individual named John Annetta. Cook opposes the motion. D.I. 77, 87. For the reasons discussed below, I will deny the government's motion.

## I.     BACKGROUND

### A. The Superseding Indictment

Cook has been charged by Superseding Indictment with one count of bank fraud, four counts of making false statements to a bank, and one count of money laundering. D.I. 36. The charges arise out of a line of credit extended by Artisans' Bank (the "Bank") to Cook's food broker business, AJJ Distributing, LLC, between 2008 and 2013. The line of credit was secured in part by accounts receivable owed to AJJ. Under the terms of the line of credit, the amount of money AJJ could borrow from the Bank was dependent on the value of "eligible items," a term which the line of credit agreement defined as "accounts receivable and inventory aged less than 90 days." *Id.* ¶ 11. Cook was contractually obligated to submit to the Bank on a weekly basis and when he sought withdrawals from the line of credit Borrowing Base Certificates ("BBCs") that listed AJJ's "eligible items." *Id.* ¶¶ 13, 14.

The bank fraud count in the Superseding Indictment accuses Cook of "engag[ing] in a scheme and artifice to defraud the Bank whereby Cook submitted and caused to be submitted over 200 false and fraudulent BBCs to the Bank." *Id.* ¶ 32. The false statement counts are based on allegations that Cook provided the Bank on four occasions with BBCs that listed certain accounts receivable that in fact were no longer owed to AJJ. *See id.* ¶¶ 46, 48, 50 and 52 (alleging Cook "provided the Bank with [ ] BBC[s] listing [million-dollar sums] in accounts receivable, which falsely inflated monies owed to AJJ").

In paragraphs 23 through 30 of the bank fraud count, under the heading "The BBCs Included Reconciled Accounts Receivable from AJJ's Main Customer," the Superseding Indictment alleges the following:

> 23. AJJ's primary customer was a large wholesale food distributor based out of New York, referred to herein as "Wholesaler."

> 24. From at least 2008 forward, AJJ and an employee of Wholesaler developed a trading relationship to allow AJJ to take advantage of special discounts only available to Wholesaler's retail supermarket customers.

> 25. Under this trading relationship, AJJ would buy items from Wholesaler, take ownership of such items, and then sell the same items back to Wholesaler.

> 26. Employees of Wholesaler identified this trading relationship as unusual; other retail supermarket customers did not generally sell items back to Wholesaler.

2

27.     As a result of this trading relationship, over time AJJ would simultaneously both owe money to Wholesaler for accounts payable and be owed money by Wholesaler for accounts receivable.

28.     Between 2009 and 2013, Cook reconciled, or "netted" the accounts payable and receivable with employees of Wholesaler's accounting department on a weekly basis via spreadsheets that Cook populated and sent to Wholesaler for verification.

29.     If AJJ owed money to Wholesaler as a result of the reconciliation of accounts payable and receivable, then AJJ would timely transfer money to Wholesaler.

30.     Between 2009 and 2013, the BBCs submitted by Cook to the Bank each included dozens of accounts receivable from Wholesaler that had already been reconciled and were no longer owing to AJJ.

*Id.* at ¶¶ 23–30.

Although the Superseding Indictment alleges that employees of Wholesaler "identified [AJJ's] trading relationship [with Wholesaler] as unusual," it does not allege to whom the employees made this "identification" nor does it allege or even suggest how the employees' characterization of the trading relationship as "unusual" bears in any way on the fraudulent scheme or false statement charges. Notably, the Superseding Indictment does not allege that the AJJ/Wholesaler trading relationship was fraudulent or even that it was part of the scheme and artifice to defraud alleged in the bank fraud count. Other than in the eight

paragraphs quoted above, the AJJ/Wholesaler trading relationship is not mentioned in the 58 paragraphs of the Superseding Indictment.

## B. Cook's Contacts With John Annetta

The government has identified John Annetta as "the employee of Wholesaler" who is alleged in paragraph 24 of the Superseding Indictment to have "developed a trading relationship [between Wholesaler and AJJ] to allow AJJ to take advantage of special discounts only available to Wholesaler's retail supermarket customers." D.I. 70 at 2.

### 1. The Cook-Annetta Relationship as Described in the Government's Motion

In its motion, the government described the AJJ/Wholesaler relationship and Annetta's role in that relationship as follows:

> The Defendant worked with accounting employees
> . . . at [Wholesaler] to determine, on a weekly basis,
> whether [Wholesaler] or AJJ owed money that week.
> They accomplished this by using "netting sheets." After
> the accounting employees and Defendant reconciled the
> accounts payable and accounts receivable, generally
> Defendant would owe [Wholesaler] money, and he
> would promptly wire money to [Wholesaler]'s account at
> Bank of America. Despite the fact that those accounts
> had already been satisfied by the time Defendant
> submitted the Borrowing Base Certificates ("BBCs") to
> [the] Bank, Defendant nonetheless listed these already
> satisfied accounts as [Wholesaler] "accounts receivable."
> By inflating his accounts receivable, Defendant was able
> to further draw down on his line of credit or avoid
> making payments in order to bring the line into

compliance with the terms of his loan agreement. This is the core fraud alleged in the Indictment.

> At the heart of the unusual trading relationship with [Wholesaler] was Defendant's personal friendship with Annetta, who was until 2013 a Senior Vice President at [Wholesaler]. Sometime prior to 2009, Annetta classified AJJ as a [Wholesaler] customer eligible for special manufacturer discounts. Unlike retail store customers (the intended beneficiaries of the manufacturer discounts) that bought the goods to stock their shelves for shoppers, Defendant would turn around and sell [Wholesaler] the same goods AJJ had bought – at a slight markup. In addition to the special pricing AJJ received, [Wholesaler] would receive a rebate from the manufacturer. As long as the rebate amount exceeded the markup on the repurchase of the same goods from AJJ, [Wholesaler] also profited from the sales to AJJ. Thus, almost all of Defendant's accounts receivable depended on AJJ's continued eligibility for those discounts, a favor bestowed by Annetta.

D.I. 70 at 2–3.

According to the government's motion, Cook "split with Annetta the profits" AJJ derived from the AJJ/Wholesaler trading relationship. *Id.* at 3. Each month, Cook "deliver[ed]" to Annetta in "paper bags of cash, generally containing $15,000-$20,000" Annetta's share of AJJ's profits from the AJJ/Wholesaler relationship. *Id.* Between 2009 and 2012, these "deliver[ies]" totaled approximately $1.5 million. *Id.*

According to the government's motion, Cook stopped making the payments and "cease[d] all contact" with Annetta after Cook learned from Annetta in March

2012 that Annetta had been questioned by law enforcement agents about cash payments Annetta had received from another Wholesaler customer that had the same type of trading relationship AJJ had with Wholesaler. *Id.* As alleged in the government's motion:

> The demise of [Cook and Annetta's] relationship, in turn, resulted in a decline in the trading of goods between AJJ and [Wholesaler]. A decline in goods purchased from AJJ by [Wholesaler] yielded fewer accounts receivable; AJJ thus had difficulty counterbalancing the accounts payable it owed [Wholesaler] for goods purchased. Soon, [Cook] lacked the ability to pay [Wholesaler], and by June 2013, [Cook] owed [Wholesaler] over $700,000. At that time, [Wholesaler] indicated [its] intent to terminate the relationship with [Cook].

*Id.* at 6.

### 2. The Cook-Annetta Relationship as Described by the Government at Oral Argument

At oral argument, the government made five representations about the AJJ/Wholesaler relationship and/or Annetta's role in that relationship that are relevant to the pending motion. First, the government informed the Court that the statement in its motion that "[s]ometime prior to 2009, Annetta classified AJJ as a [Wholesaler] customer eligible for special manufacturer discounts" (D.I. 70 at 2) was "inaccurate." Tr. at 61:6–18. According to the government, after filing its motion it learned that Annetta was *not* the person who "classified AJJ as a [Wholesaler] customer eligible for special manufacturer discounts." Tr. at 90:4–8.

The government now maintains that AJJ was "designated" as eligible for Wholesaler's special discounts "long" before 2009 and that AJJ's eligibility for such discounts "was not a new designation bestowed by Mr. Annetta in connection with the trading relationship." Tr. at 61:12–18.

Second, the government disclosed at oral argument that Wholesaler's management had approved of the AJJ/Wholesaler trading relationship alleged to have been "developed" by Cook and Annetta. Tr. at 62:12–19, 91:8–10. Thus, although Wholesaler's management did not know that Cook was paying Annetta a share of AJJ's profits, management was aware of — and had approved — Wholesaler's practices of (1) designating AJJ as eligible for discounts offered by manufacturers for retailers that stocked their shelves with certain goods the retailers purchased from Wholesaler; (2) "trading" inventory of those goods with AJJ on Wholesaler's books without actually shipping that inventory; and (3) using rebates offered to Wholesaler by the same manufacturers to profit from this trading of phantom inventory.

Third, the government represented at oral argument that it was not alleging that the AJJ/Wholesaler relationship developed by Cook and Annetta was illegal. *See* Tr. at 88:6–9 (confirming that "[t]he Government is not going to allege that the trading relationship was illegal"). Thus, the government is *not* alleging that Wholesaler, Annetta, and/or Cook defrauded manufacturers by allowing AJJ, a

7

non-retailer, to obtain through phantom transfers of inventory discounts the manufacturers intended to be passed on to retailers for actual transfers of inventory.

Fourth, and related to this last representation, the government confirmed at oral argument that it is *not* alleging that Cook's listings of accounts receivable for phantom transfers of inventory in AJJ's BBCs rendered those BBCs false. Rather, the government is alleging that the listings of such transfers were false only to the extent that some of the accounts receivable had already been paid through the reconciliation process Cook and Wholesaler conducted using the "netting" sheets. *See* Tr. at 76:15–77:11. As the prosecutor stated at oral argument, "It is not that they're a sham" but instead "that they [were] being represented as being receivables when, in fact, they ha[d] been paid." Tr. at 77:8–11.

Fifth, and finally, the government disclosed at oral argument that some of the trading between AJJ and Wholesaler involved the actual transfer of inventory:

> [PROSECUTOR]: . . . The mechanics of the trading relationship all go through Mr. Annetta and his assistant. Cook on a weekly basis marks what he wants to purchase and sends it to Mr. Annetta's assistant, who enters the order. They generate paperwork to make it look like orders are going to be shipped. There's a warehouse. Nothing ever leaves the warehouse, and then paperwork is generated in which [Wholesaler] repurchases all of that without a single item leaving the warehouse.

THE COURT: Are there bills of lading[1] prepared?

[PROSECUTOR]: There are, your Honor. **It is a little confusing because in addition to the trading relationship, which is most of what appears on the BBCs, Mr. Cook also had legitimate accounts with [Wholesaler] where you see those lading that reflect both the fraudulent purchase or the artificial purchase orders, the trading purchase orders and actual goods leaving the warehouse.** But I believe there are bills of lading.

The bills of lading . . . we don't anticipate introducing at trial . . . .

Tr. at 63:3–23 (emphasis added).

### C. Annetta's Guilty Plea

According to the government's motion, Annetta pled guilty to a tax evasion charge in 2013 and was sentenced to 20 months imprisonment. D.I. 70 at 3 n.1. The government did not provide the Court with a copy of Annetta's plea agreement or the Information by which he was charged; nor has it explained the facts that gave rise to the tax evasion charge to which he pled guilty. According to a press release issued by the United States Attorney's Office for the District of New Jersey, Annetta failed to report to the government approximately $1.6 million he was given by "two people [he] met in the course of his employment" with

---

[1] "A bill of lading is like a receipt -- it is an acknowledgement of the receipt of goods." *Bill of Lading*, MERRIAM-WEBSTER (online ed.), https://www.merriam-webster.com/dictionary/bill%20of%20lading (last visited Jan. 3, 2019).

Wholesaler. *See Senior Vice President of Operations at White Rose Foods Pleads Guilty to Tax Evasion*, U.S. DEP'T OF JUST., U.S. ATT'Y'S OFF., DIST. OF N.J. (Apr. 29, 2013) https://www.justice.gov/usao-nj/pr/senior-vice-president-operations-white-rose-food-pleads-guilty-tax-evasion (last visited Jan. 3, 2019). According to Cook's response to the government's motion, "[i]n a statement to federal authorities related to [Annetta's] plea agreement, Mr. Annetta alleged that he received income from Mr. Cook and at least one other person and that he never declared that income as taxable." D.I. 77 at 2.

## II.    DISCUSSION

The government seeks by its motion to introduce at trial Annetta's testimony that (1) Cook delivered to him each month a bag of between $15,000 and $20,000 in cash for Annetta's share of AJJ's profits derived from the AJJ/Wholesaler trading relationship and (2) Cook told Annetta after law enforcement agents interviewed Annetta that Cook could have no further contact with him. Tr. at 60:2–6. The government argues that this testimony is admissible for two reasons. It contends first that the evidence is intrinsic to the conduct charged in the Superseding Indictment. D.I. 70 at 5–7. It argues in the alternative that the evidence is admissible under Federal Rule of Evidence 404(b) to show the absence of mistake. D.I. 70 at 7–9. Cook argues that the proffered evidence should be excluded under Rules 404(b) and 402 because it is not admissible for any relevant,

non-propensity purpose. D.I. 77 at 5–6; D.I. 87 at 4–11. In the alternative, Cook argues that the evidence should be excluded under Rule 403. D.I. 77 at 7–12; D.I. 87 at 11.

## A. Applicable Legal Standards

Under Third Circuit law, evidence of uncharged wrongful acts is not admissible unless such evidence is "intrinsic" to the charged offense or is admissible under Rule 404(b). *United States v. Green*, 617 F.3d 233, 248–49 (3d Cir. 2010). Evidence is intrinsic if it "directly proves the charged offense," or if the uncharged acts in question were "performed contemporaneously with" and "facilitate[d] the commission of the charged crime." *Id.* at 248–49 (internal quotation marks and citations omitted). All non-intrinsic evidence of uncharged wrongful acts "must be analyzed under Rule 404(b)." *Id.* at 249.

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but is admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Under Rule 404(b), evidence of uncharged wrongful acts is "admissible so long as it [is] not introduced *solely* to prove criminal propensity." *Green*, 617 F.3d at 244 (emphasis in original).

11

The fact that evidence is intrinsic or is offered for a proper purpose under Rule 404(b) does not mean that it should be admitted at trial. *Id.* at 249 n.15. "Rule 403 always remains as a potential bar to admissibility." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 786 (3d Cir. 1996). Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

## B. The Cash Payments to Annetta

I consider the admissibility of the cash payments first as intrinsic evidence and then as Rule 404(b) evidence.

### 1. Whether The Cash Payments Are Admissible Intrinsic Evidence

The admissibility of the cash payments as intrinsic evidence turns on two inquiries: whether the payments are intrinsic to the charged fraud and, if so, whether the probative value of the payments is substantially outweighed by the potential dangers identified in Rule 403.

#### a. Whether The Cash Payments Are Intrinsic

The government argues that the proffered evidence of Cook's cash payments to Annetta is intrinsic to the bank fraud charged in the Superseding Indictment for two reasons. It contends first that the AJJ/Wholesaler relationship "facilitated the

bank fraud by allowing Cook to list dozens of accounts receivable on his [BBCs] that tied back to actual purchase orders from [Wholesaler]." D.I. 70 at 5. The cash payments, according to the government's briefing, are intrinsic to the fraud because they "solidified and encouraged" that relationship by giving Annetta "an incentive to continue to provide the favorable discounted pricing and a fulsome trading relationship with AJJ." *Id.*; *see also id.* at 3 (stating that "almost all of [Cook's] accounts receivable depended on AJJ's continued eligibility for those discounts, a favor bestowed by Annetta").

The problem with the government's rationale was disclosed at oral argument when the government revealed that Annetta in fact was *not* responsible for Wholesaler's designation of AJJ as eligible for favorable discount pricing. Rather, it was Annetta's supervisors who approved the extension of the retailer discount to AJJ and who approved — to use the government's word — the "unusual" trading relationship between AJJ and Wholesaler. That relationship, as the government acknowledges, was profitable to both AJJ and Wholesaler, thus giving Wholesaler's management a motive to extend to AJJ discounts from manufacturers that were intended for retailers. The relationship was, in the government's view, legitimate — i.e., the phantom transactions of inventory were not, according to the government, "a sham" or illegal. Tr. at 77:8–11. Because Wholesaler's management did not know about, let alone share in, Cook's cash payments to

13

Annetta, the link the government seeks to draw between the cash payments and "the favorable discounted pricing and a fulsome trading relationship with AJJ" is attenuated at best. Indeed, it is unclear to me what the purpose of making the alleged cash payments was. The government did not offer at oral argument a cogent explanation for why, if Wholesaler had already designated AJJ as eligible for the retailer discounts long before Cook started paying Annetta and if Annetta's supervisors knew about and approved the AJJ/Wholesaler trading relationship, Cook would have made cash payments to Annetta in the first place.[2]

The government also argues that the proffered evidence of the cash payments is intrinsic because it "directly prove[s] [Cook's] intent to defraud," as it "show[s] that [Cook] fully understood the nature of his trading relationship with [Wholesaler]." D.I. 70 at 6–7. But again, the government's prosecution theory is that Cook defrauded the Bank by listing in AJJ's BBCs accounts receivable that had already been paid through the weekly netting process, not by listing accounts receivable for phantom transactions. Thus, the "unusual" nature of the trading relationship is relevant to the alleged bank fraud under the government's theory only insofar as AJJ and Wholesaler "netted" their phantom transactions each week, after which Cook "generally" owed money to and promptly paid Wholesaler. D.I.

---

[2] According to defense counsel, other than Annetta's testimony, there is no evidence of Cook making the alleged cash payments. Tr. at 82:15–19.

70 at 2–3. Cook's alleged cash payments to Annetta shed little if any light on Cook's understanding of how this netting process worked.

In sum, the government's rationales for why the cash payments should be treated as intrinsic to the charged bank fraud are weak. With respect to both Cook's intent relative to the Bank and the means by which the charged fraud was perpetrated, the evidence has at best minimal probative value.

### b. Whether the Cash Payments Should be Excluded as Intrinsic Evidence under Rule 403

Whatever slight probative value the cash payments might have as intrinsic evidence of the charged fraud is substantially outweighed by the unfair prejudice and likelihood of jury confusion and misunderstanding that evidence of the payments would cause if admitted at trial. I find therefore that the cash payments are not admissible as intrinsic evidence under Rule 403.

Evidence that a defendant delivered bags of cash to a person convicted of tax evasion is obviously highly prejudicial. In this case, the admission at trial of such evidence would be unfair to Cook because the cash payments have no causal connection to the bank fraud charged in the Superseding Indictment. The government has not alleged a single fact that suggests a nexus between Annetta and the Bank. Indeed, the government does not even allege that Annetta knew that Cook had a line of credit or any relationship with the Bank. At bottom, under the government's prosecution theory Annetta is relevant to the bank fraud charge only

because he was Cook's point of contact at Wholesaler and the person responsible for generating the purchase orders from Wholesaler's end for the phantom inventory transactions that AJJ and Wholesaler "traded." But since the government does not contend that the phantom nature of these transactions rendered AJJ's BBCs false or defrauded the Bank, Cook's alleged payments to Annetta have no bearing on whether Cook intended to defraud the Bank or whether the Bank was defrauded.

The unfairness to Cook of admitting the evidence is compounded by the danger that the jury would be confused or misled by the evidence. In my view, it is a virtual certainty that the jury would infer from the evidence of the cash payments that Cook and Annetta were acting in concert to defraud either or some combination of: the manufacturers who offered the retailer discounts, the IRS, and/or Wholesaler. Ironically, I am unable to conceive how the jury would infer from the evidence proffered by the government that Cook and Annetta were working together to defraud the Bank. As noted, the government has not even suggested that Annetta knew about Cook's relationship with the Bank. Thus, if the evidence were admitted, it is likely the jury would be confused about the relevance of the evidence to the charged bank fraud and/or convict Cook based on uncharged conduct that at most tangentially relates to the charged fraud.

The risk that the admission of the evidence would confuse or mislead the jury is illustrated by the government's own characterizations of the AJJ/Wholesaler trading relationship at oral argument. While, on one hand, the government maintained at oral argument that the phantom transactions of inventory are neither "sham" transactions nor illegal, the government also stated that the AJJ/Wholesaler trading relationship was "a little confusing because in addition to the [phantom] trading relationship, which is most of what appears on the BBCs, Mr. Cook also had *legitimate accounts* with [Wholesaler] where you see [bills of] lading that reflect *both the fraudulent purchase or the artificial purchase orders . . . and actual goods leaving the warehouse.*" Tr. at 63:13–19 (emphasis added). The distinction drawn by the government between "legitimate" transactions that involve "actual goods leaving the warehouse" and "fraudulent" transactions that involve "artificial purchase orders" is a distinction the jury might very well make in this case without hearing evidence of the cash payments. But the admission of that evidence at trial would in my opinion substantially increase the likelihood that the jury will conclude that Cook and Annetta conspired to engage in a fraudulent scheme to trade phantom inventory and convict Cook of the bank fraud based on that conclusion. Accordingly, I believe the evidence should be excluded under Rule 403.

## 2. Whether the Cash Payments are Admissible under Rule 404(b)

The government argues in the alternative that evidence of the cash payments is admissible under Rule 404(b) to show absence of mistake. According to the government, "[t]hat [Cook] carefully tracked the [AJJ/Wholesaler] relationship in calculating and prov[id]ing payments to Annetta refutes any suggestion that [he] was simply careless or unaware of the flow of payments between AJJ and [Wholesaler]." D.I. 70 at 8.

The government may well be correct that Cook will argue or adduce evidence to show at trial that the inclusion of satisfied accounts receivable in his BBCs was the product of a mistake. Cook has requested a "good faith and theory of defense" jury instruction that states in part that "evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent." D.I. 79 at 13–14. If Cook ends up asserting at trial — through argument, questioning of witnesses, or otherwise — that his inclusion of satisfied accounts receivable in his BBCs was the product of a mistake, then the government may have a proper purpose under Rule 404(b) to seek to introduce evidence of the cash payments. But unless and until Cook asserts such a defense, I will not allow the government to introduce evidence of the cash payments. If Cook chooses to assert a defense of mistake at trial, he can proffer the contours of that defense and then I can assess how probative the cash payments

would be for rebutting that defense. Only then would I be in a position to conduct the balancing called for by Rule 403 to determine whether I should admit the evidence of the cash payments under Rule 404(b). *See Green*, 617 F.3d at 249 n.15 (noting that Rule 403 "always" applies as a potential barrier to admissibility).

## C. Cook's Statement That He and Annetta Should Cease All Contact

As in the case of the cash payments, I consider the admissibility of Cook's statement to Annetta first as intrinsic evidence and then as Rule 404(b) evidence.

### 1. Whether Cook's Statement Is Admissible Intrinsic Evidence

As with the cash payments, the admissibility of Cook's statement as intrinsic evidence turns on two inquiries: whether the statement was intrinsic to the charged fraud and, if so, whether the probative value of the statement is substantially outweighed by the potential dangers identified in Rule 403. I find that the statement is not intrinsic to the fraud and therefore need not address whether it would be admissible as intrinsic evidence under Rule 403.

The government offers two reasons for why Cook's statement to Annetta that the two men should have no further contact in the wake of Annetta's interview by law enforcement agents is intrinsic to the charged fraud. It contends first that "the demise of the [AJJ/Wholesaler] trading relationship, which began with Annetta's contact by investigators, is [] intrinsic to the charged crimes." D.I. 86 at 2. It explains:

> After Annetta disclosed to [Cook] his visit from law
> enforcement in March 2012, Cook cut off contact with
> Annetta. The demise of this relationship, in turn, resulted
> in a decline in the trading of goods between AJJ and
> [Wholesaler]. A decline in goods purchased from AJJ by
> [Wholesaler] yielded fewer accounts receivable; AJJ thus
> had difficulty counterbalancing the accounts payable it
> owed [Wholesaler] for goods purchased. Soon, [Cook]
> lacked the ability to pay [Wholesaler], and by June 2013,
> [Cook] owed [Wholesaler] over $700,000. At that time,
> [Wholesaler] indicated [its] intent to terminate the
> relationship with [Cook]. Without the [Wholesaler]
> accounts receivable, [Cook] could not continue
> defrauding the Bank. While eventually the true nature of
> the relationship between Annetta and [Cook] came to
> light and both the fraud and [Wholesaler] relationship
> came to an end, by cutting off contact with Annetta,
> [Cook] was able to extend his scheme for an additional
> year.

D.I. 70 at 6.

Although I question the government's logic that Cook's immediate cessation

of contact with Annetta enabled him to extend the bank fraud by an additional

year, I reject its argument that the demise of the relationship constitutes intrinsic

evidence for a simpler reason. Evidence of the relationship's demise provides

helpful background and "completes the story" information about the charged fraud,

but under the Third Circuit's holding in *Green*, such evidence is to be treated as

Rule 404(b) evidence, not intrinsic evidence. *See Green*, 617 F.3d at 249, 250

(holding that evidence historically treated "as background or 'completes the story'

evidence under the inextricably intertwined test" for intrinsic evidence should

instead be considered under Rule 404(b)). The demise of the trading relationship neither directly proves the alleged fraud nor facilitated it; on the contrary, the demise of the relationship explains why the fraud ended and how it was ultimately discovered by the Bank. Accordingly, it is not intrinsic to the charged fraud under *Green.*

I also reject the government's second rationale for why Cook's statement to Annetta is intrinsic to the alleged bank fraud. The government argues, as it did with respect to the cash payments, that Cook's immediate cessation of contact with Annetta "directly proves [Cook's] intent to defraud" because it "show[s] that [Cook] fully understood the nature of his trading relationship with [Wholesaler] and he took steps to keep that relationship hidden from various entities, including the [Bank's] loan officers." D.I. 70 at 6–7. In light of the government's position that the phantom trading relationship between AJJ and Wholesaler is neither illegal nor a "sham" and did not render AJJ's BBCs false or defraud the Bank, I fail to see any logical connection between Cook's hiding his relationship with Annetta and the crimes alleged against him in the Superseding Indictment. Thus, Cook's statement to Annetta is not intrinsic to those charges.

## 2. Whether Cook's Statement Is Admissible under Rule 404(b)

The government argues in the alternative that Cook's statement is admissible to show absence of mistake under Rule 404(b).[3] In the government's view, Cook's "termination of the Annetta relationship at the first sign of Annetta's legal troubles [is one] of the most salient examples of [Cook's] thorough and deliberate management of the [Wholesaler] account." D.I. 70 at 8. This argument strains logic. One could reasonably infer from Cook's immediate termination of his relationship with Annetta that Cook feared that law enforcement would learn about the AJJ/Wholesaler phantom trading relationship and the alleged cash payments to Annetta.[4] But to draw from that termination the inference that Cook deliberately and thoroughly managed his relationship with Annetta (and therefore would not have mistakenly included satisfied accounts receivable in his BBCs) is a stretch at best. Accordingly, I will deny the government's request to admit Cook's statement for the purpose of showing an absence of mistake under Rule 404(b).

---

[3] The government did not identify any purpose other than absence of mistake that would allow for the admission of Cook's statement under Rule 404(b). I therefore do not consider whether Cook's statement would be admissible for background or "completes the story" purposes. *See Green*, 617 F.3d at 249, 250.

[4] Of course, since the government maintains that the trading relationship was neither illegal nor a sham, Cook's fears would have been misplaced.

## III. CONCLUSION

For the reasons discussed above, I will deny the government's motion to admit the proffered evidence of the Defendant's contacts with John Annetta.

The Court will issue an order consistent with this Memorandum Opinion.